**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| **LOURDES RIVERA,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **NO.  22-2551** |
| | : | |
| **PRA HEALTH SCIENCES,** *et al.,* | : | |
| *Defendants.* | : | |
| | : | |

**<u>MEMORANDUM OPINION</u>**

**Goldberg, J.**                                                                **October 24, 2023**

Plaintiff Lourdes Rivera  has sued Defendants PRA Health Sciences d/b/a PRA ("PRA") and ICON PLC d/b/a/ ICON ("ICON") (collectively "Defendants") for discrimination under the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII), and 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA").  Plaintiff claims that she was subjected to a hostile work environment based on her disabilities, race, and national origin, and that when she reported her concerns, she was terminated.

Defendants now move for summary judgment on all claims against them.  For the following reasons, I will grant the Motion and enter judgment on all claims in favor of Defendants.

**I.      STATEMENT OF FACTS**

The following facts are derived from the evidence submitted by the parties and are undisputed unless noted.  Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view such evidence in the light most favorable to Plaintiffs.[1]

---

[1]      References to the parties' pleadings will be made as follows:  Defendants' Statement of Undisputed Facts ("DSUF"), Plaintiffs' Response ("PR"), Plaintiffs' Counterstatement of Undisputed Facts ("PSUF"), and Defendants' Response ("DR").  To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions.  If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits.  If a statement is disputed, but the dispute cannot be resolved by

A. **Plaintiff's Medical Conditions and Race/National Origin**

Plaintiff, who identifies as a Hispanic American, had a hysterectomy in 2004 due to ovarian cancer, and a double mastectomy in 2019.  As a result of complications from her double mastectomy, Plaintiff suffers from nerve damage and has required other surgeries.  Beginning in 2019, the nerve damage caused Plaintiff to stutter, which occurs approximately twice per day when exacerbated by stress. Plaintiff has also been diagnosed with anxiety and depression.  (PSUF ¶¶ 16–21; DR ¶¶ 16–21.)

B. **Plaintiff's Employment with Defendant**

Defendant PRA is a clinical research organization that assists pharmaceutical companies in evaluating the safety and efficacy of drugs either coming on or currently on the market by ensuring that the people who have taken them are not experiencing adverse side events.  The purpose of this work is to ensure safety issues are addressed.  Defendant ICON is also a clinical research organization that has become a leading global provider of outsourced development and services to pharmaceutical, biotechnology, medical device, government, and public health organizations.  On July 1, 2021, ICON acquired Defendant PRA.  (DSUF ¶¶ 4–6; PR ¶¶ 4–6.)

On February 23, 2021, Plaintiff—who has a Bachelor of Arts in psychology and a Baccalaureate degree in medical programming, with no graduate degrees—was hired by Defendant PRA as a Drug Safety Associate (Level 2).  (DSUF ¶¶ 1, 83; PR ¶¶ 1, 83.)  In connection with her employment, Plaintiff filed out a Voluntary Self-Identification of Disability form on which she checked the box indicating, "No, I Don't Have A Disability, Or A History/Record of Having a Disability."  (Def.'s Ex. 3.)  Plaintiff explained that she believed she was being accurate by checking that form, noting, "I do have a disability, but I'm also able to work."  (Pl.'s Ex. A, Dep. of Lourdes Rivera ("Rivera Dep.") 147:22–24.)

As a Drug Safety Associate (Level 2), Plaintiff was an integral part of the drug safety testing process.  (DSUF ¶ 7; PR ¶ 7.)  Defendants hired Plaintiff to work on a particular drug for a particular

_____

reference to the exhibits, I will note the dispute.  I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

program for one specific client.  (Rivera Dep. 25:20–23.)  Plaintiff was tasked with selecting cases from a queue and entering information from the case into a database, including adverse or serious events the patient experienced while taking the drug.  (DSUF ¶ 9; PR ¶ 9.)  As this process was regulated by the FDA, Plaintiff agreed that mistakes could reflect poorly on Defendants to both the client and the FDA. (DSUF ¶ 10; PR ¶ 10, Rivera Dep. 29: 23–29:25.)  Plaintiff was never issued any discipline during her employment with Defendants.  (PSUF ¶ 12; DR ¶ 12.)

**C.  <u>Alleged Harassment by Stavroula Oikonomidou</u>**

Plaintiff worked on a team of Drug Safety Associates, including Paul Abbott (White, non-disabled), Lavanya Kankanala (Asian, non-disabled), Sruthi Musku (Asian, non-disabled), Kelly Finno (White, non-disabled), Judy Logan (white, non-disabled), Linda Fazio (White, non-disabled), and Stavroula Oikonomidou (Greek European, non-disabled).  All of these individuals, including Plaintiff, reported to Erik Hudson.  (PSUF ¶¶ 9, 12; DR ¶¶ 9, 12.)

Ms. Oikonomidou is the only individual employed by Defendants that Plaintiff believes harassed her in any way.  Ms. Oikonomidou, who is of Greek descent, was based in Germany and was the Lead Drug Safety Associate.  She did not have authority to hire or fire Plaintiff.  Ms. Oikonomidou never met Plaintiff in person, and all of her interactions with Plaintiff were by phone call, video call, or email. (DSUF ¶¶ 13–17; PR ¶¶ 13–17.)

From March through May 2021, Ms. Oikonomidou and Plaintiff regularly interacted, sometimes multiple times in a day or week.  At one point, early on in her employment, Plaintiff informed her supervisor about a medical appointment.  Ms. Oikonomidou was made aware of this appointment and asked personal questions, learning that Plaintiff had had a double mastectomy.  (PSUF ¶¶ 19, 26; DR ¶¶ 19, 26.)

Plaintiff testified that the first incident of harassment by Ms. Oikonomidou took place in early June 2021.  Plaintiff had entered a case and submitted it to Ms. Oikonomidou, who disagreed with how the case was coded.  Ms. Oikonomidou changed the coding and sent it to the client, who then requested

that the coding be revised to how Plaintiff had originally submitted it.  (DSUF ¶ 21; PR ¶ 21.)  Thereafter, Plaintiff, Ms. Oikonomidou and another employee named Kelly Finno had a video call to discuss this case.  Plaintiff claimed that Ms. Oikonomidou stated that Plaintiff needed more training and testified that "[a]t the time I was speaking to her [Oikonomidou], I was stuttering a lot, and the first thing she said was, some Americans are so stupid, like her."  Plaintiff then indicated that, the following day, Ms. Oikonomidou made fun of her stutter, called her "breastless," and "made fun of [her] sister for having cancer."  According to Plaintiff, Ms. Finno did not harass or discriminate against her.  (DSUF ¶¶ 20–26; PR ¶¶ 20–26.)

Plaintiff testified that several other instances of harassment by Ms. Oikonomidou occurred "between June and July."  In total, Plaintiff testified that Ms. Oikonomidou called Plaintiff "breastless" twice—once during the second video call in June 2021, and a second time "around July"—and called her a "stupid American" only the one time, during the June 2021 video call.  (DSUF ¶¶ 28–30; PR ¶¶ 28–30.)  Plaintiff also indicated that Ms. Oikonomidou made fun of her stutter "[m]aybe about twice, or three times, that I recall."  (Rivera Dep. 57:22–25.)  When asked about any other instances of harassment, Plaintiff testified that Ms. Oikonomidou called her twice while she was out on medical leave.  (DSUF ¶ 32; PR ¶ 32.)

After the first incident of harassment in early June, Plaintiff testified that because Drug Safety Associates access cases for review from a queue, Ms. Oikonomidou limited Plaintiff's ability to process cases.  (DSUF ¶¶ 33–34; PR ¶¶ 33–34.)  Plaintiff stated that Ms. Oikonomidou "wouldn't let me get any cases to work on, she decided not to give me no cases, or she would give me cases that she wanted me to do."  (Rivera Dep. 43:14–20.)  Plaintiff further alleges that upon return from medical leave in July 2021, Ms. Oikonomidou told Ms. Finno to instruct Plaintiff "not to touch any other cases" and otherwise inhibited her ability to process cases from the queue.  (DSUF ¶ 35; PR ¶ 35.)

Ms. Finno had previously spoken to Ms. Oikonomidou about "the way she interacts with people."  Indeed, another employee, Sharon Sidlow, previously had a hard time working with Ms. Oikonomidou

4

due to her brash and direct way of speaking, and Ms. Finno had addressed the issue previously with Ms. Oikonomidou.  (PSUF ¶ 31; DR ¶ 31.)

      **D.**      <u>Allegations Against Other Employees and Defendants' Investigation</u>

Aside from Ms. Oikonomidou, Plaintiff asserts that three other of Defendants' employees discriminated against her: her supervisor, Erik Hudson; Human Resources professional, Sam Cobley; and Human Resources professional, Lauren Siegel.  Plaintiff testified that their discrimination was limited to their failure to take her concerns about Ms. Oikonomidou's conduct seriously and properly investigate it.  (DSUF ¶ 36; PR ¶ 36.)

Plaintiff testified that she reported her concerns about Ms. Oikonomidou's actions to Mr. Hudson around June 18, 2021.  She also sent him an email regarding her concerns on June 21, 2021.  Plaintiff then forwarded to Mr. Hudson emails, which she believed provided examples of harassment by Ms. Oikonomidou.  When Mr. Hudson reviewed the emails, he responded that he did not see anything "too concerning."  (DSUF ¶¶ 38–41; PR ¶¶ 38–41.)

Nonetheless, on June 18, 2021, upon receiving Plaintiff's complaint, Mr. Hudson called Mr. Cobley in Human Resources and left him a voicemail regarding Plaintiff's concerns.  (DSUF ¶ 42; PR ¶ 42.)  The following Monday morning, June 21, 2021, Mr. Hudson emailed Mr. Cobley that he didn't "think [Plaintiff] intended to call HR, doesn't really have a case, and just started trying to throw out anything she could because I was holding her accountable for production and quality."  (Pl.'s Ex. T.)  In response, to Plaintiff's June 21, 2021 email, Mr. Hudson  then wrote to Mr. Cobley that he was "not replying to this until you and I can sync up . . ."  (Pl.'s Ex. V.)  Mr. Cobley noted, "Good plan, I email [Plaintiff] and get time with her asap today."  (<u>Id.</u>)  On June 22, 2021, Mr. Hudson emailed Mr. Cobley again and stated that he "had a call with Kelly [Finno] and Stavi [Oikonomidou] this morning and let them know that [Plaintiff] was to work through Kelly [Finno] in the meantime and not to interact with [Oikonomidou]."  (Pl.'s Ex. W.)

On June 21, 2021, Plaintiff and Mr. Cobley discussed her concerns, and thereafter, Plaintiff had a similar conversation with Ms. Siegel, who then began an investigation into these complaints, including interviews with Plaintiff, Ms. Finno, Mr. Hudson, and a Human Resources colleague from Germany, Norbert Van Der Linden.  (DSUF ¶¶ 43-46, PR ¶¶ 43–46.)   Ms. Finno denied overhearing any inappropriate statements from Ms. Oikonomidou.  (Def.'s Ex. 12, Dep. of Lauren Siegel, 28:10–21.)

On June 23, 2021, Plaintiff went out on medical leave for severe anxiety and depression.  (DSUF ¶ 48; PR ¶ 48; PSUF ¶ 57; DR ¶ 57.)  Plaintiff alerted Ms. Cobley to the fact that Ms. Oikonomidou called her twice regarding job-related issues while Plaintiff was on leave.  (DSUF ¶ 49; PR ¶ 49; PSUF ¶ 60; DR ¶ 60.)  During that same time period, the Human Resources investigation ended and concluded that no discrimination had occurred.  (DSUF ¶ 50; PR ¶ 50; Siegel Dep. 27:18–21.)  When Plaintiff returned from leave on July 19, 2021, she was told the investigation had been concluded but was not told the outcome.  (DSUF ¶¶ 51–52; PR ¶¶ 51–52.)

Plaintiff testified that after she complained about the harassment, Hudson "seemed to change" around her.  Their bi-weekly one-on-one talks stopped, and their communication was "totally different." The only time Plaintiff communicated with him again was in August.  (Rivera Dep. 154:5–21.)

### E.    Plaintiff's Termination

In August 2021, Plaintiff was informed by Mr. Hudson that the client supporting the project she was hired to work on decided to end the project.  (Rivera Dep. 63:20–64:8.)  Plaintiff agreed that the project coming to an end, in and of itself, was not discriminatory and was common in the industry.  (Id. at 68:16–19.)

When a program comes to an end, Defendants have an initiative called THRIVE to assist them with finding reemployment within the companies (both PRA and ICON).  (PSUF ¶ 63; DR ¶ 63.)  Mr. Hudson told Plaintiff that Defendants would try to assist in placing her on a different project, and he directed her to apply for positions listed on the career page.  The following day, one of Defendants' recruiters contacted Plaintiff regarding a Drug Safety Associate position—a higher level position—and

indicated that she had spoken to Mr. Hudson about Plaintiff.  Plaintiff scheduled and attended an interview but was told that she was not hired for the position.  (Rivera Dep. 68:20–70:2.)  The hiring manager, Svetlana Bar, indicated that she felt that Plaintiff was not ready for the significantly increased scope and responsibility of that position.  (DSUF ¶ 74; PR ¶ 74.)  Ms. Bar later hired Maggie (Yunyan) Zhang, who had practical experience in the relevant industry, as well as a Bachelor of Medicine, a Masters of Gynecology & Obstetrics, and a Master of Sciences in Physiology.  (Def.'s Ex. 15, Decl. of Svetlana Bar ("Bar Decl.") ¶¶ 8–10.)

Plaintiff also applied for a Drug Safety Associate (Level 2) position—the same role she had previously held with Defendants.  (DSUF ¶ 79; PR ¶ 79.)  Plaintiff spoke with Mr. Hudson about the position and sent in her resume but never heard back.  (PSUF ¶ 67; DR ¶ 67.)  Mr. Devanshu Saini, who holds bachelor's and master's degrees in pharmacy, was ultimately hired for this position.  (DSUF ¶¶ 81–82; PR ¶¶ 81–82.)

Human Resources Manager Padraic Burke informed Plaintiff in August that if she was not reassigned, she would be terminated.  (PSUF ¶ 73; DR ¶ 73.)  Ultimately, Plaintiff did not secure another assignment, and her employment ended on September 1, 2023.  (DSUF ¶ 85; PR ¶ 85.)  Some members of Plaintiff's department were retained, while others were terminated.  (Pl.'s Ex. QQ, 3–4.)

### F.  **Procedural History**

On June 30, 2022, Plaintiff filed suit against Defendants, setting forth claims under the Americans with Disability Act ("ADA"), violations of Title VII (race/national original discrimination, hostile work environment and retaliation, violations of 42 U.S.C. § 1981.  She later amended er Complaint to add a claim under the PHRA.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary

> judgment is sought. The court shall grant summary judgment if the
> movant shows that there is no genuine dispute as to any material fact and
> the movant is entitled to judgment as a matter of law. The court should
> state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue, in rebuttal. Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015). The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment is appropriate if the non-moving party provides merely colorable, conclusory or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252. Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993). Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 241 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

**III. DISCUSSION**

 **A. Hostile Work Environment Claims Based on Disability, Race, and National Origin under the ADA, Title VII, 42 U.S.C. § 1981, and the PHRA**

The United States Supreme Court has noted that "[w]orkplace conduct is not measured in isolation," so when a workplace "is permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001), and Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). As the ADA contains language that is almost identical to Title VII, the United States Court of Appeals has assumed, without specifically deciding, that the ADA similarly precludes a hostile work environment based on disability or perceived disability. Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 666 (3d Cir. 1999).[2]

To succeed on a hostile work environment claim based on disability, the plaintiff must establish that (1) she is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that the employer knew or should have known of the harassment and failed to take prompt effective remedial action. Id. at 667. To succeed on a hostile work environment claim based on race, the plaintiff must establish that (1) the employee suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013). For purposes of this Motion, Defendants challenge only whether the alleged harassment rose to the level of "severe or pervasive."

---

[2]     Hostile work environment claims pursuant to the PHRA and 42 U.S.C. § 1981 are also subject to the same analysis as hostile work environment claims pursuant to the ADA and Title VII. See Larochelle v. Wilmac Corp., 769 F. App'x 57, 61 (3d Cir. 2019) (in respect to Title VII); Doe v. Triangle Doughnuts, LLC, 472 F. Supp. 3d 115, 132 (E.D. Pa. 2020).

"The inquiry into whether the discriminatory or retaliatory environment was 'severe or pervasive' recognizes that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment." Komis v. Sec'y of U.S. Dept. of Labor, 918 F.3d 289, 293–94 (3d Cir. 2019).  "The 'severe or pervasive' element requires [a plaintiff] to show that her work environment became so abusive because of the discriminatory actions by her supervisors and co-workers that it changed the very nature of her employment." Komis v. Perez, No. 11-cv-6393, 2014 WL 3437658, at *2 (E.D. Pa. July 15, 2014); see also Mufti v. Aarsand & Co., Inc., 667 F. Supp. 2d 535, 545 (W.D. Pa. 2009) ("[T]he conduct must be extreme to amount to a change in the terms and conditions of employment.").  "In examining alleged 'severe or pervasive' discrimination in a workplace, the court must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Doe v. Triangle Doughnuts, 472 F. Supp. 3d 115, 132 (E.D. Pa. 2020) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (internal quotations and brackets omitted)).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) do not amount to discriminatory changes in the 'terms and conditions of employment.'" Clark Cnty, 532 U.S. at 271 (quotation omitted).  "Likewise, seemingly discriminatory behavior when actually motivated by personal animosity is not prohibited by Title VII." Koschoff v. Henderson, 109 F. Supp. 2d 332, 346 (E.D. Pa. 2000).

Taking all of the evidence in the light most favorable to Plaintiff, none of the facts identified by Plaintiff and supported by the evidence objectively give rise to "severe or pervasive" discrimination resulting in discriminatory changes in the terms and conditions of her employment.

With respect to her hostile work environment claim based on disability, the evidence certainly reflects that Ms. Oikonomidou was unprofessional and that her comments were tasteless and particularly mean-spirited.  But the ADA is not a "general civility code . . . the ordinary tribulations of the workplace,

such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" do not support a hostile work environment claim." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotations omitted). Indeed, courts have recognized that "teasing in the workplace is not uncommon, and in most instances probably not actionable. Stuttering is mimicked; the overweight are called names; acne, baldness, and height are mentioned for a laugh. All of this can be hurtful. But mockery of overt features does not necessarily support damages." Fox v. Costco Wholesale Corp., 918 F.3d 65, 76 (2d Cir. 2019).

Thus, Ms. Oikonomidou's six identified comments over the course of two months—calling Plaintiff "breastless" twice, calling her a "stupid American" one time, and making fun of her stutter once on a video call in June 2021 and on two to three occasions thereafter—are neither sufficiently pervasive nor severe as to amount to a change in the terms and conditions of Plaintiff's employment. Rather, at best, they constitute unpleasant and offensive workplace teasing motivated by a personality conflict, all of which occurred over the phone or videoconferencing. Indeed, Ms. Oikonomodo was not Plaintiff's supervisor and was never, at least during the relevant period, physically present in the same country as Plaintiff.[3] Certainly such comments were insensitive, but "[i]nsensitivity alone does not amount to harassment." Martin v. Allegheny Airlines, Inc., 126 F. Supp. 2d 809, 820 (M.D. Pa. 2000) (quotations omitted); see, e.g., Woods v. AstraZeneca Pharms., L.P., No. 19-cv-230, 2023 WL 2393649, at *24 (M.D. Pa. Mar. 7, 2023) (granting summary judgment in favor of employer on hostile work environment claim where statements about medical issues and related missed work time made "on numerous occasions" over a three-year period did not "contaminate an environment" or "alter the conditions of her

---

[3]     Plaintiff also notes that Ms. Oikonomidou contacted her twice while she was on medical leave. A coworker calling a plaintiff during a medical leave to find out when she will be returning to work does not give rise to a hostile work environment claim. See Walton, 168 F.3d at 667 n.4 (finding that supervisor's calling plaintiff ten days consecutively when plaintiff was hospitalized, asking each day when she would be returning to work, does not amount to harassment); Barclay v. Amtrak, 435 F. Supp. 2d 438, 448 (E.D. Pa. 2006) (supervisor's insistence on doctor's notes for unexcused absences and requiring plaintiff to check in before taking a sick day does not rise to the level of sufficiently severe or pervasive for a hostile work environment claim).

employment."); <u>Lescoe v. Pa. Dept. of Corrections-SCI Frackville</u>, 464 F. App'x. 50, 54 (3d Cir. 2012) (holding, in hostile work environment claim by morbidly obese plaintiff, that frequent "jokes and comments about [plaintiff's] weight, the size of his belly, and not being able to see his groin area" did not "reach a level of sufficient severity or pervasiveness to alter the conditions of Lescoe's employment") <u>White v. Aldridge Elec., Inc.</u>, No. 21-cv-1872, 2022 WL 1003765, at *8 (E.D. Pa. Apr. 4, 2022) (comments that plaintiff "needed  hearing aids" and should "look into changing jobs" were "ill-mannered" but did not create a hostile work environment); <u>Kendrell v. Mattis</u>, No. 17-cv-229, 2018 WL 5785446, at *7 (E.D. Pa. Nov. 5, 2018) (granting summary judgment in disability hostile work environment claim where supervisor subjected plaintiff to unnecessary and sarcastic criticism because of plaintiff's mental disability, and told plaintiff that "she was tired of hearing Asperger's Syndrome as an excuse"); <u>McCutchen v. Sunoco, Inc.</u>, No. 01-cv-2788, 2002 WL 1896586, at *12–13 (E.D. Pa. Aug. 16, 2002), <u>aff'd</u>, 80 F. App'x 287 (3d Cir. 2003) (granting summary judgment in favor of employer on hostile work environment claim where employee with partial blindness alleged coworkers called him "useless," made comments while plaintiff was reading that "for a guy that can't see you know how to look in a book," remarked that in doing tasks, plaintiff "didn't have to see, he merely needed to feel around," kicked some cans in the parking lot and told plaintiff "okay, you can see that.  Go on over there and pick it up," and chose to forego assigning job duties to plaintiff because of their belief that his disability precluded him from managing them).[4]

　　　Plaintiff produces no evidence beyond the comments set forth above from which a factfinder could conclude that the harassment was severe or pervasive. Indeed, Plaintiff points only to her subjective perception of this treatment, noting that she felt "hurt and demeaned."  (Pl.'s Opp'n Summ. J. 25).  While Plaintiff's subjective feelings are understandable, they do not give rise to an actionable legal claim for a

---

[4]　　　Defendants also contend that Plaintiff cannot demonstrate that they knew of the harassment and failed to take prompt, effective remedial action.  As I find that the alleged harassment was neither severe nor pervasive, I need not address this argument.

hostile work environment under the ADA.  See Greer v. Mondelez Global, Inc., 590 F. App'x 170, 173

(3d Cir. 2014) ("'mere offensive utterances' are insufficient to create a hostile environment, even if they

engender offensive feelings in an employee.").  Accordingly, I will grant Defendants' Motion for

Summary Judgment on Plaintiff's disability hostile work environment claim.

    Likewise, Plaintiff's hostile work environment claim based on race/national origin must fail.  A

hostile work environment claim premised on race/national origin similarly requires a showing of "severe

or pervasive" discrimination.  The sole comment identified by Plaintiff, however, is Ms. Oikonomidou's

statement, made during a June 2021 video call, that "some Americans are so stupid, like her."  Such a

singular remark does not rise to a change in the terms and conditions of Plaintiff's employment.  See

Sherrod v. Phila. Gas Works, 57 F. App'x 68, 75–77 (3d Cir. 2003) (holding that alleged incidents,

including managers making comments that "the way [two African-American employees] were eating at

their desks, it must be their culture," and that if such clerks did not do their work, "I'm going to sit at

their desks with a whip," were not sufficiently severe and pervasive, even considering the comments in

conjunction with other facially neutral, alleged mistreatment of the employee); LaRochelle v. Wilmac

Corp., 210 F. Supp. 3d 658, 694 (E.D. Pa. 2016) (granting summary judgment in national origin hostile

work environment claim where a co-worker refused to work with plaintiff because of her nationality and

the way she spoke English, another co-worker called her a "stupid immigrant" and "bitch" and said all

aliens should be made to return to their countries, and the manager tolerated these comments, assigned

plaintiff the more difficult assignments, and accused plaintiff of faking injuries; court found that the

comments did not rise to the level of severe or pervasive); Rose v. Woolworth Corp., 137 F. Supp. 2d

604, 607–11 (E.D. Pa. 2001) (granting summary judgment for defendant on a hostile work environment

claim where plaintiff alleged a supervisor subjected plaintiff to "constant and unremitting negative

comments and evaluations" based at least in part on plaintiff's race, referred to Black community as a

"baby factory," stated Blacks are incapable of thinking analytically, and warned the plaintiff, who was

Black, not to talk to white women).  As such, I will grant Defendants' Motion for Summary Judgment on this claim as well.

**B.  ADA Discrimination/Retaliation Claims under Title VII, § 1981, the ADA, and the PHRA**

Plaintiff also brings three claims of discrimination: (1) one premised on her disability; (2) one premised on her race/national origin; and (3) one premised on retaliation for protected activity in complaining about the other discrimination.  All three claims rely on the same burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[5]

Under the McDonnell Douglas framework, the plaintiff must first prove by a preponderance of evidence a *prima facie* case of discrimination.[6] McDonnell Douglas, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. Id. at 802–03. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons," but rather may simply introduce admissible evidence that, if taken as true, would permit a finding that the challenged employment action

---

[5]     Race and national origin-based discrimination claims brought under Title VII and the PHRA and race-based claims brought under § 1981 are all analyzed under the same burden-shifting scheme.  See Greer v. Mondelez Global, Inc., 590 F. App'x 170, 172 n.4 (3d Cir. 2014) ("Because the substantive elements of an employment discrimination claim brought under § 1981 are identical to those brought under Title VII, § 1981 claims are also governed by the McDonnell Douglas burden-shifting framework."); Bartlett v. Kutztown Univ., No. 13-cv-4331, 2015 WL 766000, at *8 n.12 (E.D. Pa. Feb. 23, 2015) (noting that the analysis for adjudicating discrimination claims under the PHRA is identical to that of a Title VII inquiry).  Because Plaintiff's race/national origin claims are based on the same conduct and analyzed under the same framework, I shall consider them together.
        Similarly, the ADA retaliation provision is similar to that in Title VII, § 1981, and the PHRA.  Accordingly, ADA retaliation claims are analyzed under the same framework employed for Title VII, § 1981, and PHRA retaliation claims.  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997); Hanafy v. Hill Int'l, Inc., No. 22-cv-878, 2023 WL 3010176, at *10 n.7 (E.D. Pa. Apr. 19, 2023).

[6]     Where a Plaintiff has direct evidence of discrimination—*i.e.*, overt or explicit evidence that directly reflects a discriminatory bias that is causally related to the adverse employment decision—he or she need not rely on the McDonnell Douglas framework.  Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004).  Plaintiff here does not claim to have any such direct evidence of discrimination.

was taken for legitimate, nondiscriminatory reasons.  <u>Texas Dept. of Cmty. Affairs v. Burdine</u> 450 U.S. 248, 254 (1981).

Finally, if the employer meets its burden of production, the presumption of discrimination "drops out of the picture" and the plaintiff must convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000); <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994).  Throughout this process, "the ultimate burden of proving intentional discrimination always rests with the plaintiff."  <u>Anderson v. Wachovia Mortg. Co.</u>, 621 F.3d 261, 271 (3d Cir. 2010) (quotations omitted).

1.   *Prima Facie* Case

The first step of the burden-shifting framework requires that a plaintiff establish a *prima facie* case of discrimination or retaliation.  The elements of this *prima facie* case differ slightly according to the precise claim brought.

A *prima facie* claim of disability discrimination under the ADA or PHRA[7] requires a plaintiff to show he is "(1) disabled within the meaning of the ADA, (2) can perform essential functions of his job with or without reasonable accommodation, and (3) suffered an adverse employment action as a result of his disability."  <u>Drummer v. Trustees of Univ. of Pennsylvania</u>, 286 F. Supp. 3d 674, 682 (E.D. Pa. 2017) (citing <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000) and <u>Gaul v. Lucent Technologies Inc.</u>, 134 F.3d 576 (3d Cir. 1998)).

To establish a *prima facie* case of race/national origin discrimination, a plaintiff must show that he (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410–11 (3d Cir. 1999).

---

[7]      The Pennsylvania Human Relations Act (PHRA) contains similar prohibitions and the parties agree that these claims may be analyzed "identical[ly]" to Plaintiff's federal claims. See <u>Jones v. Se. Pa. Transp. Auth.</u>, 796 F.3d 323, 327 (3d Cir. 2015).

Finally, to establish a *prima facie* case of retaliation under Title VII, § 1981, or the ADA, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995).

Here, Defendants concede that Plaintiff was a member of a protected class for purposes of her race/national origin claims, and engaged in protected activity for purposes of her retaliation claims. Moreover, they do not dispute that Plaintiff was qualified for her position and suffered an adverse employment action. They contend, however, that Plaintiff has failed to either (a) produce evidence that she is "disabled" within the meaning of the ADA or PHRA, or (b) produce evidence that she was terminated/not retained under circumstances giving rise to an inference of discrimination.

### a.  Whether Plaintiff Was "Disabled"

To prove disability discrimination, Plaintiff must first establish that a factfinder could conclude that she had a disability or was regarded as having one. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999). In 2008, Congress "expanded the [ADA]'s non-exhaustive list of 'major life activities' and declared that the definition of disability shall be construed in favor of broad coverage of individuals under [the] Act, to the maximum extent permitted by the terms of [the] Act." Mills v. Temple Univ., 869 F. Supp. 2d 609, 620 (E.D. Pa. 2012) (quotation omitted).

A disability is any physical or mental impairment that "substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "[T]o establish a statutorily protected disability, the employee must show that she has an impairment; identify the life activity that she claims is limited by the impairment; and prove that the limitation is substantial." Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 382 (3d Cir. 2004). This standard "is not meant to be . . . demanding." 29 C.F.R. § 1630.2(j)(1)(i). "To undertake th[e] [required] individualized assessment, courts have required some evidence of the

plaintiff's substantial limitation—even when the limitation seems self-evident in context." <u>Alston v. Park Pleasant, Inc.</u>, 679 F. App'x 169, 172 (3d Cir. 2017).

"An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Notably, where a plaintiff is only "regarded as" disabled, and does not suffer from any actual disability, the perceived impairment must not be "transitory and minor," defined as an expected duration of six months or less.  42 U.S.C. § 12102(3)(B).  "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action." <u>Kiniropoulos v. Northampton Cnty. Child Welfare Serv.</u>, 917 F. Supp. 2d 377, 386 (E.D. Pa. 2013) (quoting <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 109 (3d Cir. 1996)).

Here, Plaintiff contends that her "double mastectomy and resulting nerve damage/stutter as well as anxiety and depression[,] qualify as disabilities."  (Pls.' Opp'n Summ. J. 17.)  She asserts that she had her double mastectomy in 2019 (prior to her employment with Defendants) and, since that time, has had five additional surgeries (two of which post-date her employment with Defendants) to address complications.  (Rivera Dep. 107:6–17.)  Plaintiff also contends that her first corrective surgery resulted in nerve damage causing a stutter, which "substantially interferes with [her] daily activities, including communication."  (Pls.' Opp'n Summ. J. 17.)  In addition, she claims her double mastectomy causes ongoing pain resulting in "difficulty driving, cleaning, and working."  (Pls.' Ex. PP.)

Defendant counters that, when first completing paperwork after her hire in 2021, Plaintiff prepared a voluntary self-disclosure form wherein she checked off the box indicating that she did not have a disability or record of having a disability.  (Def.'s Ex. 3; Rivera Dep. 147:7–12.)  When asked whether she believed her life activities were at all limited by her disabilities, she stated that she could work and that she tried to do everything she possibly could, with a disability or not.  (Rivera Dep. 147:18–

150:3.)  Plaintiff also agrees that she has been cancer-free since 2004 and had the double mastectomy as a prophylactic measure.  (Id. at 39:3–40:3.)  As such, Defendant concludes that she had no limitation on any major life activity.

Nonetheless, Plaintiff has also produced evidence that she has a stutter that "sometimes" interferes with her speaking.  (Rivera Dep. 40:22–41:4.)  A stutter has been recognized a possible impairment that can affect a major life activity.  See Medvic v. Compass Sign Co., LLC, No. 10-cv-5222, 2011 WL 3513499, at *7 (E.D. Pa. Aug. 10, 2011) (recognizing that a stutter, even one that is episodic, can be a disability).  A plaintiff "can still be substantially limited in communicating even if [s]he is able to communicate at times without limitation."  Id.  A plaintiff need not be incapable of performing activities where oral communication is necessary to be disabled within the meaning of the ADA.  Id.; see also 2008 ADA Amendments Act of 2008 (rejecting the "permanent" and "long term" requirement embodied in the original Act and stating that "episodic or in remission fits within the definition of disability if it would substantially limit when active.").  As I find evidence from which a jury could conclude that when Plaintiff's stutter is active, it substantially limits her ability to communicate, I will deny summary judgment on this ground.[8]

      b.   <u>Whether Plaintiff Has Produced Evidence of any Causal Connection Between Her Disability/National Origin/Race/Protected Activity and the Adverse Employment Action</u>

Defendant also contends that Plaintiff has failed to produce evidence to establish the causation prong of her prima facie case.

To demonstrate a *prima facie* case of causation based on disability or on national origin/race, a plaintiff must point to evidence sufficient to create an inference that a causative link exists between her disability/protected status and her termination.  See Equal Emp. Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990) (holding that under the fourth element, a plaintiff can satisfy his

---

[8]     Having determined that a genuine issue of material fact exists as to whether Plaintiff has a disability, I need not address whether she was perceived as having a disability.

burden by presenting evidence upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons."); see also Isley v. Aker Philadelphia Shipyard, 275 F. Supp. 3d 620, 628 (E.D. Pa. 2017).  The burden of proving the *prima facie* case "is not intended to be onerous."  Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995). ("The prima facie case merely 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'") (internal citations omitted).  "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment."  Lichtenstein v. Univ. of Pitt. Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2014) (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)).  "Where the temporal proximity is not 'unusually suggestive,' [the court] ask[s] whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'"  Id. (quoting LeBoon, 503 F.3d at 232 (further quotations omitted)).

For a retaliation claim, a plaintiff has a similarly low bar of proving causation.  Carvalho–Grevious v. Del. State Univ., 851 F.3d 249, 258–59 (3d Cir. 2017) (citing 42 U.S.C. § 2000e-2(m)).  At the *prima facie* stage, the plaintiff must simply produce evidence "sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action."  Id. at 259 (emphasis and alteration in original) (quoting Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)).  To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if "unusually suggestive."  Id. at 260; see also Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007).  "Days are suggestive, months are not."  Rosati v. Colello, 94 F. Supp. 3d 704, 717 (E.D. Pa. 2015) (citing cases).  In the absence of such a close temporal proximity, the court should "consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and

any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015).

Here, as to her race/national origin claim, Plaintiff cites to a single, stray comment by Ms. Oikonomidou—calling her a "stupid American"—in early June 2021, three months prior to her September 2021 termination from Defendants' employ.  The record is otherwise devoid of any proof of discriminatory animus directed at Plaintiff because of her race or national origin.  "Where other evidence of discrimination is lacking, stray remarks by nondecisionmakers are too isolated to show independently that unlawful discrimination, rather that the defendant's asserted lawful reason, caused the adverse action." Stone v. West River Group, No. 18-cv-1640, 2022 WL 4472470, at *11 (M.D.Pa., 2022) (citing Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)).  In turn, I find that Plaintiff has failed to produce evidence from which a reasonable jury could conclude that her termination was premised on either race or national origin.  Accordingly, I summary judgment will be granted on this claim in favor of Defendants.

As to her disability claim, Plaintiff points to several comments about her disability from Ms. Oikonomidou occurring in June and July 2021.  Plaintiff also contends that she went out on medical leave beginning on June 23, 2021, for severe anxiety and depression and did not return until July 2021.  In July, she learned that the project to which she had been assigned was coming to an end and that she needed to find a new assignment.  Less than a month later, she applied for two such positions but was not hired.  As a result of her inability to secure another assignment, her employment ended on September 1, 2023, less than two months after she returned from her leave.  "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity," Lichtenstein, 691 F.3d at 307, the temporal proximity here falls within the realm of what courts have found sufficient at the *prima facie* stage.  Accordingly, I deem this prong satisfied for purposes of her disability claim.

Finally, as to her retaliation claim, Plaintiff testified that she reported her concerns about Ms. Oikonomidou's actions to Mr. Hudson around June 18, 2021, and Defendants investigated her claims

into early July 2021.  Although such temporal proximity is not, in and of itself, unduly suggestive, Plaintiff also noted that after she complained about the harassment, Mr. Hudson "seemed to change" the way he was with her, their one-on-one talks every two weeks stopped, and their communication was "totally different."  (Rivera Dep. 154:50–10.)  Under the relatively light *prima facie* standard, such evidence is sufficient to allow a reasonable jury to conclude that retaliatory animus had a "determinative effect" on Plaintiff's ultimate termination.

        2.   <u>Whether Defendants Have Set Forth a Legitimate Nondiscriminatory Reason for Not Rehiring Plaintiff</u>

Once the plaintiff has successfully established a *prima facie* case, the burden shifts to the employer who must "articulate a legitimate nondiscriminatory reason for the adverse employment action."  <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 412 (3d Cir. 1999).  This second step of <u>McDonnell Douglas</u> does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Instead, the employer must provide evidence allowing the factfinder to determine that the decision was made for nondiscriminatory reasons. <u>Fuentes</u>, 32 F.3d at 763.

Here, Defendants have articulated a legitimate, non-discriminatory reason for Plaintiff's termination.  According to the undisputed facts, Plaintiff worked for Defendant as a Drug Safety Associate (Level 2) to assist pharmaceutical companies in evaluating the safety and efficacy of their drugs.  She was hired to work on a specific project for a specific client.  In August 2021, Plaintiff was informed by Mr. Hudson that the client supporting the project she was hired to work on decided to end the project, and Plaintiff was aware that her inability to secure another assignment would result in her termination on September 1, 2023.  Plaintiff agrees that the project coming to an end was common in the industry and, in and of itself, was not discriminatory.

As to Defendant's failure to secure reemployment for Plaintiff within the company through its THRIVE program—an initiative which assists employees on a terminated project with finding

reemployment—Defendants produce evidence that although it considered Plaintiff for two different positions (a Drug Safety Associate position and a Drug Safety Associate (Level 2) position), it ultimately chose to hire other candidates who were more qualified.  Specifically, with respect to the Drug Safety position (a higher position than Plaintiff currently held), the hiring manager, Svetlana Bar, testified that Plaintiff was not ready for the significantly increased scope and responsibility of that position.  (DSUF ¶ 74; PR ¶ 74.)  Defendants hired Maggie Zhang, who had practical experience in the relevant industry, as well as a Bachelor of Medicine, a Master of Gynecology & Obstetrics, and a Master of Sciences in Physiology.  (Bar Decl. ¶¶ 9–10.)  As to the Drug Safety Associate (Level 2) position (the same role Plaintiff had held with Defendants), Defendants hired Devanshu Saini, who held bachelor's and master's degrees in pharmacy.  By contrast to both of these individuals, Plaintiff holds only a Bachelor of Arts in psychology and a Baccalaureate degree in medical programming, with no graduate degrees.  (DSUF ¶ 83; PR ¶ 83.)  Such a proffer of evidence that other candidates were more qualified than Plaintiff satisfies Defendants' burden of articulating a legitimate, non-discriminatory reason for not hiring her.  See Gardner-Lozada v. SEPTA, 643 F. App'x 196, 200 (3d Cir. 2016); Casseus v. Kessler Inst. of Rehab., 45 F. App'x 167, 169 (3d Cir. 2002).

> 3. Whether Plaintiff Has Produced Evidence that Defendants' Reasons Were Mere Pretext for Discrimination or Retaliation

Once an employer satisfies this second step of the McDonnell Douglas test, the presumption of discrimination drops out of the picture and the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual.  Burton v. Teleflex Inc., 707 F.3d 417, 426–27 (3d Cir. 2013).  The burden of proving pretext is a difficult one.  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  There are two methods by which a Plaintiff may do so.  Under the first method of discrediting the employer's reasons, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally

find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes, 32 F.3d at 765. The plaintiff cannot simply show that the employer's decision was wrong or mistaken, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." Fuentes, 32 F.3d at 765; see also Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) ("[T]he plaintiff must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.")

To show pretext under the second method—that discrimination was more likely than not a cause for the employer's action—"the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that" the plaintiff's protected trait "was a motivating or determinative factor in the employment decision." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644–45 (3d Cir. 1998). Among other things, the plaintiff may show that the employer has previously discriminated against him/her, has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class. Id.; Saellam v. Norfolk S. Corp., No. 06-cv-123, 2008 WL 5286836, at *7 (W.D. Pa. Dec. 19, 2008).

Here, given the undisputed facts from which a reasonable jury could find that Defendants had a legitimate nondiscriminatory reason for not retaining Plaintiff, she must now identify evidence that could suggest that the reason was pretext for discrimination or retaliation. In an effort to meet her burden, Plaintiff points to what she deems "a lot of evidence from which a fact-finder could easily disbelieve Defendants' proffered reason" for failing to retain her. (Pl.'s Opp'n Summ. J. 11.) None of this evidence, considered both individually and collectively, is sufficient to raise a genuine issue of material fact.

First, Plaintiff cites to the discriminatory comments from Ms. Oikonomidou referring to her as "breastless" on two occasions and mocking her stutter. Nothing in the record suggests, however, that Ms. Oikonomidou had any decisionmaking capacity for Defendants or were part of any employment

decision.  "[C]omments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination."  Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997); see also Fuentes, 32 F.3d at 767 (stray remarks divorced from employment decisions do not support a conclusion of pretext).

Second, Plaintiff claims that subsequent to both her complaints about Ms. Oikonomidou's behavior and her medical leave from June 23, 2021 to July 19, 2021, supervisor Erik Hudson "seemed to change."  (Rivera Dep. 154:5–6.)  She indicated that Mr. Hudson seemed dismissive about her discrimination claims and stated in emails that he did not "see anything too concerning."  (Pl.'s Ex. P.)  She also claimed that there was less communication from him, and he cancelled all their one-on-one meetings.  She believed that "it was a favoritism, since [Oikonomidou] was there longer than [Plaintiff."  [9]  (Id. at 154:8–155:4.)

Such evidence does not raise any genuine issue of material fact.  At the summary judgment stage, a showing of pretext requires that Plaintiff provide evidence beyond her own subjective belief of discrimination.  See Murrell v. Penn Presbyterian Medical Center, No. 18-cv-1202, 2019 WL 2177911, at *6 (E.D. Pa. May 17, 2019) (granting summary judgment for the employer, finding no evidence of pretext for the employer's decision to terminate the plaintiff. The plaintiff alleged that she had "a feeling" there was discrimination against her but cited no reason or motivation that her employer would have to terminate the plaintiff for her disability); Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 271 (W.D. Pa. 2010) (holding that plaintiffs' subjective belief that they were put at the far end of the conference table and constantly interrupted because they were older were insufficient to establish pretext), aff'd, 451 F. App'x 238 (3d Cir. 2011).  Here, Defendant produces undisputed evidence that

---

[9]     In her brief, Plaintiff alleges that in response to her complaints about discrimination, Hudson "expressed explicit disdain and anger, treated Ms. Rivera rudely, falsely reported to other managers that she had performance problems, despite that she [sic] had previously praised her as performing 'great' work and having not disciplined her."  (Pl.'s Opp'n Summ J. 11.)  The actual deposition testimony does not substantiate this characterization.

Hudson actively engaged with Human Resources in connection with her discrimination complaints. Plaintiff then went out on leave only five days after relaying her concerns to Hudson. When Plaintiff returned, she concedes the ramp down of her project was occurring, thus lessening the need for Hudson's one-on-one meetings with her. As such, Plaintiff's mere speculative belief that something "seemed to change" with Hudson is insufficient to attribute such behavior with discriminatory animus or to discredit Defendants' proffered basis for her termination.

Third, Plaintiff claims that the timing of events was suspicious because Defendants failed to retain her approximately two months after she complained of harassment and approximately three weeks after returning from medical leave. The undisputed evidence, however, establishes that the project for which Plaintiff was hired was concluding as of August 31, 2021. As such Plaintiff was subject to termination unless she secured another position. Plaintiff agreed that this was normal in the industry and that there was nothing discriminatory about it.

Fourth, Plaintiff asserts that Defendants selected two candidates outside of Plaintiff's protected classes and who were hired from outside the company. She contends that Defendant's "subjective and unsupported argument" that the selected candidates were more qualified than her is belied by the fact that Plaintiff worked in the field for twenty-one years and had actually been performing the position with Defendants for six months.

This argument does not undermine Defendants' undisputed evidence that Maggie (Yunyan) Zhang and Devanshu Saini, who were hired for the positions, had both practical experience in the relevant industry and significantly higher and more relevant education in the field than Plaintiff. "A plaintiff's subjective belief that his qualifications should have been accorded more weight is not probative of pretext." Jackson v. Trump Entertainment Resorts, Inc., 149 F. Supp. 3d 502, 508 (D.N.J. 2015). Even if Plaintiff were a better choice, "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent." Fuentes, 32 F.3d at 765.  "The fact that a court may think that an employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981).

Fifth, Plaintiff posits that during her six months of employment with Defendants, she was not issued any discipline for any reason and was, in fact, praised for her performance.  Even assuming Plaintiff had indeed performed at a satisfactory level, however, that fact would not tend to suggest that Defendants' decision to hire more qualified candidates was mere pretext for discrimination.  Moreover, Plaintiff's subjective belief that her performance was "satisfactory" simply because she was never disciplined for any problems is insufficient to discredit Defendants' decision.  In his deposition, Hudson explicitly testified that two other employees had separately raised to Mr. Hudson Plaintiff's performance issues, involving productivity and error rate, well prior to the events at issue.  (Pl.'s Ex. J, Dep. of Erik Hudson ("Hudson Dep.") 24:19–26:2.)  He also noted that he continued to receive reports about her performance through June of 2021.  (Id. at 27:2–28:4.)  At that time, he discussed these concerns with Plaintiff, at which time Plaintiff raised her accusations about Oikonomidou's comments, prompting Hudson to stop any further discussions about her performance.  (Id. at 28:5–22.)

Finally, Plaintiff contends that, in litigation, Defendants have attempted to hide Hudson as a decisionmaker in the relevant adverse actions.  Although Hudson testified that he was not involved in the decision to terminate Plaintiff or the decision not to hire her into the positions she applied for prior to termination, Plaintiff contradicted his testimony, noting that Hudson directly told her that he was one of the people with authority to make the decision regarding hiring for the Drug Safety Coordinator position. (Rivera Dep. 150:22–151:19.)  Plaintiff now argues that "[t]his contradiction not only reflects a blatant factual dispute but also highlights that Defendants are trying to conceal Hudson's involvement (since he was well aware of Ms. Rivera's complaints of discrimination and medical leave)."  (Pl.'s Resp. Opp'n 12.)  According to Plaintiff, evidence that a defendant hid the real decision-maker is evidence of pretext and precludes summary judgment.

Plaintiff's cases cited in support of this argument are distinguishable as, in each of those cases, the evidence suggested that the defendant-employer concealed the decisionmaker in a way that was probative of pretext. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 152–53 (2000) (plaintiff introduced evidence that a director at the defendant-employer, who had made numerous age-biased comments, was the actual decisionmaker behind the plaintiff's firing); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 285 (3d Cir. 2000) (plaintiff introduced evidence that the decision to fire her was made solely by the director who made sexual advances toward her, contradicting defendant-employer's assertion that plaintiff was fired because "upper management" made the decision); Sabbrese v. Lowe's Home Centers, 320 F. Supp. 2d 311, 325–26 (W.D. Pa. 2004) (finding evidence of pretext where defendant-employer could not identify any decisionmaker because none of defendant-employer's employees acknowledged that they made the ultimate decision to fire the plaintiff).

By contrast here, although there is some discrepancy as to Hudson's precise involvement in hiring for the Drug Safety Coordinator position, nothing in the record suggests that Defendant hid the identity of the final decisionmaker in a way that is probative of pretext. Unlike in Reeves and Farrell, there is no evidence that Hudson ever made any discriminatory comments towards Plaintiff. Moreover, unlike in Sabbrese where the defendant-employer failed to identify any decisionmakers, Defendants identified Svetlana Bar—the individual with whom Plaintiff interviewed—as the decisionmaker, and Plaintiff agreed that  Bar had some of the decisionmaking authority. (Rivera Dep. 151:4–19.) Bar attested that she felt that Plaintiff was not ready for the significant scope and responsibility required of a Drug Safety Coordinator, and that the individual hired, Maggie Zhang, was highly qualified and interviewed well. (Defs.' Ex. 15.) Plaintiff has attributed no discriminatory animus to Bar. As such, Plaintiff's evidence is not sufficient to show weaknesses or implausibilities in Defendants' proffered legitimate nondiscriminatory reason for not retaining Plaintiff.

In short, Plaintiff has failed to meet her burden under the McDonnell Douglas framework of setting forth an evidentiary basis on which a reasonable jury could find pretext. Taking all facts in the

light most favorable to Plaintiff, Plaintiff's term of employment with Defendants was coming to a close due solely to the nature of the project on which she was working.  Plaintiff agrees that that termination was not discriminatory and that it was incumbent on her to secure a new position in Defendants' employ. Although Plaintiff has some identified discriminatory comments and actions by individuals also employed by Defendants, such comments/actions were far removed from the ultimate decision to hire certain candidates over Plaintiff for new opportunities.  Defendants have offered legitimate, non-discriminatory reasons for those decisions.  Plaintiff, in turn, has not presented any basis on which a jury could disbelieve those reasons.  Accordingly, I will grant summary judgment in favor of Defendants.

An appropriate Order follows.